

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00334-CV

_____

IN THE INTEREST OF Y.W., A CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-705952-21

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

In four issues on appeal, Y.W.'s father[1] challenges the four conduct grounds and one paternity-related ground upon which the trial court relied to terminate Father's parent–child relationship with Y.W. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D)–(E), (N)–(O), (b)(2), 161.002(b). Although we modify the judgment to strike the paternity-related ground, we affirm the remainder of the judgment as modified.

### Background: Removal

The Department of Family and Protective Services became involved with Y.W.'s family when, on September 10, 2021, Mother delivered Y.W. two minutes after arriving at the hospital alone. Mother "was irate, very aggressive, [and] had kicked some doctors in the process of trying to get [Y.W.] delivered." According to the Department's investigator, "there were concerns of [Mother's] mental health and possibl[e] substance abuse." When the Department's investigator arrived at the hospital, Mother "squeezed" Y.W. and yelled at the investigator, saying she would kill the investigator before allowing the investigator "to take another baby from her."

While the investigator talked to Mother, Mother went back and forth from being aggressive to detached; at one point, "in the middle of [the] conversation, [Mother] just like zoned out and started looking straight ahead, [her] eyes went wide,

---

[1]Although the trial court also terminated the parent–child relationship between Y.W. and her mother, Mother did not appeal.

and she just let her arms drop[,] and [Y.W.] kind of rolled off her." Mother also growled "like a dog" at the investigator. Although Y.W. was not hurt, the investigator feared for the baby's safety.

Mother told the investigator that she and Father had come to Texas to have Y.W. because she thought that she would be able to keep Y.W. here; Mother had not been "able to keep [her] baby in Memphis." According to the investigator, Mother and Father "knew that there were . . . several concerns in another state and they knew that if they tried to have [Y.W.] there, that the baby . . . would be removed, so they felt [that by] coming here, they would be able to keep" Y.W. Mother told the investigator that the Memphis case began because someone there had called CPS when that child would not stop crying all night because of colic. But the investigator did not believe Mother's claim about how that case had started.

Mother denied using drugs at the time of Y.W.'s birth but admitted that she had used heroin and marijuana in the past. According to Mother, though, she had not used drugs since 2018. The trial court admitted Y.W.'s hospital records, which contained a note that Mother had "endorse[d] heroin use during pregnancy." The investigator believed that meant Mother had told the hospital staff that she had used

heroin during her pregnancy. The notes also show that Mother left the hospital before an ordered "UDS"[2] could be collected, but Y.W.'s "UDS [was] negative."

The investigator spoke to Father about the Memphis CPS case; he supported Mother's story that the child had been removed for having colic and "not growing" as a result. Father also admitted, however, that "the removal happened because he was smoking a little bit of marijuana." Father told the investigator that he and Mother had come to Texas "initially for the jobs and resources," but he confirmed that he knew the baby would be removed if born in Memphis and that "they felt they could have the baby here and keep the baby."

Although Father admitted to using heroin as well as marijuana in the past, he would not admit that he was using drugs at the time of Y.W.'s birth. Father agreed to take a drug test when he assumed it would only test his urine; when the investigator "discussed the hair follicle test, he refused altogether." This refusal concerned the investigator because "the hair follicle goes back longer than the urine test."

When the investigator asked Father about Mother's odd behavior, he told her that Mother "was in active psychosis because she was triggered from the removal of the last child and assumed that [the investigator] would remove" Y.W. Father was concerned about Mother's mental health and the fact that she was not taking her

---

[2]From the context, this abbreviation likely refers to a urine drug screen. *See Sec. Nat'l Ins. v. Murrell*, No. 02-11-00155-CV, 2012 WL 3115733, at *5 n.3 (Tex. App.— Fort Worth Aug. 2, 2012, pet. denied) (mem. op.).

medication. But Father also told the investigator that he had talked Mother out of taking the medication "because of their religion and [because] he felt like she needed to . . . do different things besides the medication for her mental health." The investigator agreed when asked, "So he told you that he was activ[ely] preventing [Mother] from . . . taking her medication?"

Mother admitted that she had been "diagnosed with severe bipolar." According to the investigator, Mother "said that she was on anti-psychosis medication and some tranquilizers, so for a doctor to prescribe her those medications, . . . we [the Department] felt she needed to take -- be on those and -- medication compliant."

Father told the investigator that he and Mother were living in a room at the Salvation Army and would take Y.W. there with them to live. Although they did not have supplies other than a bassinet, Father said "someone was going to help them once they got [Y.W.] back to the facility."

After observing Mother and talking with Mother and Father, the Department's investigator decided to remove Y.W. from their care. The Department was not only concerned about Mother's mental health and possible substance abuse, but it also had "concerns for possible . . . domestic violence." The investigator's supervisor had called the Memphis authorities, who told the Department of "concerns of domestic violence there." Father told the investigator "that he had been arrested for violence against [Mother] while she was pregnant in . . . Memphis." Although the Memphis

5

authorities had wanted Father to address those concerns through services, he "had not been able to for various reasons."

Although the investigator asked Mother and Father about possible placement options, they said that they had no family or other persons who could care for Y.W. The investigator found that there was "reason to believe" that Mother had engaged in neglectful supervision but also ruled that she was "unable to determine" if Father had engaged in neglectful supervision because "[h]e was a little less cooperative than" Mother.

Although the investigator "set up a visit" for Mother and Father with Y.W., they did not attend.

**Background: Post-removal**

The Department placed Y.W. in a foster home where she remained until trial. Sometime before April 2022, Mother and Father moved out of state. At the time of trial, they were living in North Carolina.

The OCOK[3] permanency specialist spoke with Mother and Father via Zoom only once; her only other conversations with them were via text. At the time of trial in August 2022, Mother had not started any recommended services, and Father had not

---

[3]OCOK is a private provider of community-based care that contracts with the Department to provide foster-care case management, kinship, and family reunification services in parts of the state, including Tarrant County. *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pets. denied) (mem. op.).

completed any.[4] The OCOK specialist had tried to set up services for them out of state, but Mother and Father refused to give her their address. They also told the specialist that they would not work any services. By the time of trial, Mother and Father had not visited Y.W. or made any phone calls to her despite the fact that the specialist had offered to coordinate virtual visitation. Mother and Father told the specialist that "they didn't need OCOK to tell them when they [could] see their children."

OCOK completed an ICPC[5] for a paternal cousin in North Carolina, but North Carolina "decided to close the home study" because the cousin did not submit supporting documentation. No other home studies were pending at the time of trial, but Y.W.'s foster home was adoption motivated.

At the start of the final trial, Father's counsel requested that Father be allowed to participate via Zoom, but the trial court denied the request. At the end of trial, Father's counsel informed the trial court that Father had agreed to the temporary

---

[4]They also refused to take any drug tests, which were required by their service plan.

[5]ICPC stands for Interstate Compact on the Placement of Children. Tex. Fam. Code Ann. §§ 162.101(3), .102. According to the ICPC, "states cooperate to place children across state lines . . . 'in a suitable environment and with persons or institutions having appropriate qualifications and facilities.'" *In re Y.J.*, No. 02-19-00235-CV, 2019 WL 6904728, at *2 n.3 (Tex. App.—Fort Worth Dec. 19, 2019, pets. denied) (mem. op.) (quoting Tex. Fam. Code Ann. § 162.102).

order requiring that he complete services but that he had done so before deciding to move out of state.

## Applicable Law and Standard of Review

For a trial court to terminate a parent–child relationship,[6] the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Here, the trial court found under (b)(1) that Father—an alleged father under the Family Code[7]—had endangered Y.W., had constructively abandoned her, and had "failed to comply with the provisions of a court order that specifically established the actions necessary . . . to obtain [her] return." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (N)–(O).[8] However, the trial court also found that Father had

---

[6]Under the Family Code, a parent includes "a man who has acknowledged his paternity under applicable law." Tex. Fam. Code Ann. § 101.024(a).

[7]An alleged father is a man who alleges himself to be, or is alleged to be, a child's genetic or possible genetic father but whose paternity has not yet been determined. Tex. Fam. Code Ann. § 101.0015. Section 161.001(b) also applies to an alleged father. *See id.* § 161.002(a) ("Except as otherwise provided by this section, the procedural and substantive standards for termination of parental rights apply to the termination of the rights of an alleged father."); *In re C.M.C.*, No. 14-12-00186-CV, 2012 WL 3871359, at *3 (Tex. App.—Houston [14th Dist.] Aug. 30, 2012, pet. denied) (mem. op. on reh'g).

[8]The trial court also found that Father did not prove by a preponderance of the evidence that he was unable to comply with specific provisions of the order or that he made a good-faith effort to comply but that his failure to do so was not his fault. *See* Tex. Fam. Code Ann. § 161.001(d).

failed to respond to the suit by timely filing an admission of paternity, a counterclaim for paternity, or a request that voluntary paternity be adjudicated under Chapter 160 of the Family Code; thus, the trial court determined that Father's rights could also be terminated under Family Code Section 161.002(b)(1). *See id.* § 161.002(b)(1) (allowing termination of alleged father's rights—without proof of a Section 161.001(b)(1) predicate conduct ground—if the alleged father fails to respond to the suit by acknowledging paternity). Father challenges the legal and factual sufficiency of the evidence to support all of these grounds.

To determine whether the evidence supporting termination is legally sufficient, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of the entire record," *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014), to decide whether a

9

factfinder could reasonably form a firm conviction or belief that the Department proved the applicable conduct grounds and that terminating the parent–child relationship would be in the child's best interest, Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

For both types of review, we must remember that the factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

### Alleged-Father Termination Ground

Father contends that the evidence was legally and factually insufficient to support terminating his parent–child relationship with Y.W. under Family Code Section 161.002(b)(1). The Department concedes that termination according to this ground was improper.

Under Section 161.002(b)(1), "[t]he rights of an alleged father may be terminated [summarily] if . . . after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity." *Id.* § 161.002(b)(1); *see id.* § 160.404 (providing for termination of parental rights of alleged father who has not claimed paternity according to Section 161.002). However, if the alleged father files an admission of paternity, the Department must then prove one of the grounds for termination under Section 161.001(b)(1) before his parental

10

rights can be terminated. *In re R.W.*, No. 02-22-00143-CV, 2022 WL 10509078, at *10–11 (Tex. App.—Fort Worth Oct. 18, 2022, no pet. h.) (mem. op.). Section 161.002(b)(1) "does not prescribe any formalities that must be observed when 'filing' an admission of paternity or for such admission to be effective." *Id.* at 11. Thus, an alleged father's admission of paternity may be made in filings responsive to the Department's suit, including in an affidavit of indigency. *See id.*

Here, Father signed a "Request for Counsel/Affidavit of Indigence," in which he swore that he was "a parent of the child/ren named above." He signed the Department's service plan as a parent, and his appointed trial counsel appeared on his behalf at pretrial permanency hearings and at trial, where she referred to Father as one of the "parents." Accordingly, we hold that Father sufficiently admitted paternity and participated in the suit so that the trial court erred by terminating the parent–child relationship according to Section 161.002(b)(1). *See id.*; *In re J.L.A.*, No. 04-13-00857-CV, 2014 WL 1831097, at *2 (Tex. App.—San Antonio May 7, 2014, no pet.) (mem. op.); *In re K.E.S.*, No. 02-11-00420-CV, 2012 WL 4121127, at *3 (Tex. App.—Fort Worth Sept. 20, 2012, pet. denied) (mem. op. on reh'g).[9]

---

[9]Father argues within this issue that the evidence is insufficient because the State did not offer any evidence that he was not a presumed father, i.e., evidence that he was not married to Mother when Y.W. was born. *See* Tex. Fam. Code Ann. § 161.002(b); *see also id.* § 160.204 (providing that man is presumed to be child's father if, among other things, "he is married to the mother of the child and the child is born during the marriage"). We need not address this argument, however, because Father's admission of paternity is dispositive. *See C.M.C.*, 2012 WL 3871359, at *3 (noting that

We sustain Father's fourth issue, but our sustaining this issue is not dispositive of the appeal. Because Father admitted paternity, we must also address whether the evidence supports at least one of the predicate conduct grounds under Section 161.001(b)(1).

## Endangerment Grounds

In his first issue, Father challenges the trial court's findings under Section 161.001(b)(1)(D) and (E): that he "knowingly placed or knowingly allowed [Y.W.] to remain in conditions or surroundings which endanger[ed her] physical or emotional well-being" and that he "engaged in conduct or knowingly placed [Y.W.] with persons who engaged in conduct which endanger[ed her] physical or emotional well-being." Because "the collateral consequences of terminating parental rights under [these subsections] are significant," and because Father has challenged termination under these grounds, we must address his complaint with a "detailed analysis." *In re N.G.*, 577 S.W.3d 230, 234, 237 (Tex. 2019).

To "endanger" a child means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.) (citing, e.g., *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). Under Subsection 161.001(b)(1)(D), we examine evidence about the child's environment to determine if

paternity admission gives alleged father right to proceed to trial and require Department to prove at least one Section 161.001(b)(1) predicate conduct ground).

the environment caused the physical or emotional endangerment. *In re T.R.*, No. 02-20-00359-CV, 2021 WL 1421423, at *3 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.). A parent's conduct in the home—such as illegal drug use or drug-related criminal activity—can create an environment that endangers a child's physical and emotional well-being. *Id.* Under Subsection 161.001(b)(1)(E), we ask whether evidence shows that the parent's conduct directly resulted in the child's endangerment. *Id.* The behavior must constitute a voluntary, deliberate, and conscious course of conduct. *Id.* But that conduct need not be directed at the child, and we may infer the specific danger to the child's well-being from the parental misconduct alone. *Id.* "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

According to Father, the endangerment-related evidence "was extremely truncated and limited in scope" and related mostly to Mother's conduct. He acknowledged that "there was evidence of prior drug use . . . by [his] own admission," but "there was no evidence to indicate that [he] was continuing to use drugs." Also, he contends that his proposal to take Y.W. to the Salvation Army should not have been concerning to the Department because "[t]here was no evidence that the shelter was unsafe, nor was there evidence that the shelter demonstrated a risk of harm to" her. Father also emphasized that Y.W. had never been left in his care; thus, according

13

to him, "it was impossible for [the Department] to assert that [he] took any action or committed any omission that actively endangered" Y.W.

Although there is no direct evidence that Father knew that Mother used illegal drugs while pregnant,[10] he knew that she suffered from mental-health issues, yet urged her to stop taking her prescribed medication. Her resulting behavior at the time of Y.W.'s birth was endangering to Y.W. And even with his knowledge of Mother's mental-health issues, Father intentionally traveled with a pregnant Mother to Texas—where they had no place to live—for the sole purposes of evading the Memphis child-protection authorities and attempting to avoid involvement by the Department in Texas. *See id.*

Additionally, Father never saw or attempted to visit Y.W. after her birth. A parent's lack of contact with a child and his or her absence from the child's life endanger the child's emotional well-being. *In re E.C.*, No. 07-21-00204-CV, 2022 WL 663279, at *2 (Tex. App.—Amarillo Mar. 4, 2022, pet. denied) (per curium) (mem. op.). Furthermore, missed visitations, drug use, and failure to complete a court-ordered service plan may support an endangerment finding because such conduct

---

[10] *See In re J.W.*, 645 S.W.3d 726, 749–50 (Tex. 2022) (agreeing that "a parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment and thus support an endangerment finding" but clarifying that such a determination is fact-specific and declining to "endorse attributing any and all known dangers posed to a child during the mother's pregnancy to the other parent").

subjects children to instability and uncertainty. *Id.* at \*3 (citing *D.L.G. v. Tex. Dep't of Fam. & Protective Servs.*, Nos. 03-20-00314-CV, 03-20-00315-CV, 2020 WL 6789208, at \*5 (Tex. App.—Austin Nov. 19, 2020, no pet.) (mem. op.)); *C.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00164-CV, 2021 WL 3073263, at \*4 (Tex. App.—Austin July 21, 2021, no pet.) (mem. op.) (including as consideration in endangerment analysis that Mother had "absconded from another state with the children without notifying the state's child-welfare agency as she was required to do"); *In re I.D.G.*, 579 S.W.3d 842, 852 (Tex. App.—El Paso 2019, pet. denied) (op. on reh'g) (considering as part of endangerment analysis that mother had refused to accept parental responsibility and failed to complete most of the services required by her service plan); *In re D.A.*, No. 02-15-00213-CV, 2015 WL 10097200, at \*5–6 (Tex. App.—Fort Worth 2015, no pet.) (mem. op.) (reciting mother's history of illegal drug use, minimal effort to comply with service plan, lack of regular visitation with children, and threat to abscond with the children to another state as evidence supporting endangerment finding).

Evidence that Father sought to avoid the involvement of child-protection authorities with Y.W., that he knew of and encouraged Mother to cease taking her prescribed mental-health medications, that he failed to even attempt to see or visit with Y.W., and that he failed to comply in any significant way[11] with the service plan

---

[11]Father contends that he complied with the requirement to maintain a stable home by securing a space in the Salvation Army shelter, that there was no evidence he

to which he had agreed,[12] is both legally and factually sufficient to support the trial court's endangerment findings. We therefore overrule his first issue.

Because we need uphold only one Section 161.001(b)(1) predicate ground to affirm a termination judgment when the best-interest finding has not been challenged, we need not address Father's second and third issues challenging the evidentiary sufficiency of the subsection (N)—constructive abandonment—and (O)—failure to comply with the court-ordered service plan—grounds. *See* Tex. R. App. P. 47.1.; *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022).

---

was unemployed or had no income, and that he had refrained from engaging in criminal conduct; therefore, he contends that he complied with the service plan in part. But the trial court was entitled to weigh this potentially minimal compliance against Father's refusal to comply with most of the requirements of the service plan as well as Father's refusal to give any information to the OCOK specialist attempting to administer his service plan. For the same reason, we need not assign any meaningful weight to these facts in performing our analysis of the evidence.

[12]We have also reviewed the service plan's requirements, which are sufficiently specific. *See In re N.G.*, 577 S.W.3d 230, 239 (Tex. 2019). For example, the plan requires Father to (1) "provide verification of housing and income to the caseworker," (2) "successfully obtain and maintain a stable legal source of income through employment, or other means, such as SSI, that effectively meets all needs for him to maintain financial independence and show the ability to provide basic necessities such as food, clothing, and shelter for his child," (3) "maintain regular contact with the OCOK caseworker [with names, telephone numbers, and addresses provided] and provide any address or telephone number changes within 3 days," (4) "attend all scheduled visitations with his children," (5) "enroll in [a] parenting class," (6) "complete a drug and alcohol assessment through . . . Recovery Resource Council," which is identified by address and phone number, (7) "comply with all request[s] for random drug testing by the Department/OCOK," and (8) "complete a psychological assessment through a [D]epartment approved provider."

## Conclusion

Having sustained Father's fourth issue, we modify the judgment to strike the Section 161.002 finding. Having determined that the evidence was both legally and factually sufficient to support the trial court's endangerment predicate findings, we affirm the remainder of the judgment as modified. *See M.P.*, 639 S.W.3d at 704; *In re J.A.*, No. 04-20-00242-CV, 2020 WL 5027663, at *4 (Tex. App.—San Antonio Aug. 26, 2020, no pet.) (mem. op.); *see also* Tex. R. App. P. 43.2(b).

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  December 22, 2022

17